pension fund against Allega Concrete. Mr. Prytel. Members of the Court, I'm Keith Prytel. I represent the appellant in this matter, Allega Concrete Corporation. Let me see if I can start by trying to shorten the argument today. I will yield, concede, relinquish my six minutes of reserve rebuttal time if the appellee in this case can tell me the Federal Register volume and page number where they made application for the 2013 Withdrawal Liability Rules being approved by the PBGC, and then the same volume, page number, where in fact the PBGC approved those 2013 Withdrawal Liability Rules. Those are requirements by the PBGC. Requirements for what, is the question. Has there been any change since 1985 in the notice requirement? Your argument seems to be that because there was a unilateral change in the fee schedule, the entire set of regulations for arbitration went up in a puff of smoke. Obviously the district judge didn't agree, and that's my question to you. Why should a change in the fee schedule relieve your client of the need to meet the filing deadline, and who is to get the filing? Two reasons for that, Judge. First of all, the fee schedule as this Court has held, and I think you were on a panel that has held that the fee schedule is part and parcel of the initiation process. If you don't tender those fees, you don't have initiation. And let's suppose that's right, and therefore one would think, on your view, the changes made in 2012 and 2013 were entirely ineffectual. Correct. And therefore, the things proved in 1985 remain in force. Okay, well I can go back. That's your problem. That's what you need to deal with. Well, I'll go back to the problem that you've identified, Judge. First, let me get to the second part of it, is because the fee structure acts effectively as a bar to you going to arbitration. I mean, if you take Central States' argument, which Central States has argued to this Court. Now look, I don't think you listened to what I said. The changes made recently are entirely ineffectual, and therefore what was approved in 1985 remains in force. So your client should have sent the demand for arbitration, as provided in 1985, with the fees provided in 1985. And if that had been rejected, you would have a good argument. But that's not what your client did. Well, I think I have a good argument now, but let me address that, because the Court's jumped to that. The Central States cannot rely on that kind of reason or logic for at least three independent reasons, Judge. First of all, they never argued that in the District Court. Their position in the District Court was, every time we brief this matter, the 2013 rules govern. Second of all, the plan is the plan's sponsor. They therefore have fiduciary duties under ERISA to follow the exacting text of the plan and the trust agreement. What does the trust agreement say? The trust agreement says, look, we're going to follow the arbitration, American arbitration rules. What do the American arbitration rules say? They say the form of the arbitration rules, in effect, at the time the arbitration demand is made, are the ones that control it. That's the 2013 rules. Third, the 2013 rules were applied against my client, Olega Concrete Corporation. We had to come up with that $4,000 initiation fee to get the process rolling. We didn't pay the $650, nor would they have accepted the $650 1986 fees. So I don't think they can rely on something they never argued in the District Court. And for the other reasons, I don't think it matters. There's been an argument made in the briefing of the central states, and this was an argument that was continuously made in the District Court, that they never received the demand from Anthony Olega Concrete Corporation for withdrawal liability arbitration. The MEPA statute, as you know, doesn't have any special form or any special hoops you have to jump through. You simply have to send the demand to the fund. And the timing is what is set up by the statute. Sixty days after 120 days, if you make a request for review, which everybody concedes we made a request for review here. And that date, according to the District Court, as it counted out the dates, was July 16th, 2013. On July 9th, central states received an e-mail communication from our office, on behalf of Olega Corporation, to three, the chief of the fund, Tom Nien, I think his name is. He's the executive director of the fund, and three other independent subordinates of him, saying we're going to arbitrate. We are demanding arbitration in the case. The next day, July 10th, they received an overnight letter of that same communication, and in the record is the Federal Act signature block, or electronic signature of the individual who received it at central states. So how they continue to argue they never received a demand for arbitration, they did it in the District Court, and they're doing it again in this court, is beyond me. I don't know what else I need besides an e-mail communication that's confirmed receipt, and a FedEx signed document that's confirmed receipt. Who doesn't? I mean, you were pointing out that you were going to demand arbitration. No, no, no, no. That was the demand, Judge Mannion. That was the demand. What they argued is that when you have withdrawal liability in this setting, you have to make progress amortized payments over the time. It says it is the intention of OJ Corporation to demand arbitration. Is that the demand? The demand is what the communications are July 9th and July 10th, Your Honor. I don't have the exact language. I'm at a much earlier letter. Yeah, yeah. Is that in your record here? Yes, it is. It's in a District Court record at 16-1, page 43, and then the overnight letter along with the signed signature block is 16-1, 94-95. Is that in here? Yes. It's not in the short appendix. It's in the overall appendix, the Rule 30 appendix, Your Honor. What you're looking at is that when we make these amortized payments, we made the payments. You make them before you're judged guilty or whatever. We made the amortized payments, and each payment we said, it is our intention to demand arbitration. Then when you ask for reconsideration because we're statutorily exempt from we are going to demand arbitration here. This is what central states did here as a gotcha. They tried to use the statute as a gotcha. There was no surprise we were going to demand arbitration here. They received a timely demand from us. So now they're saying, well, we want to apply these unapproved, never promulgated, never issued to the PBGC rules of the AAA and use them against you. That's inconsistent with the statute, the MEPA statute, which says you only have to do timely notice to the fund. It's inconsistent with the PBGC regulations, which say you only have to give timely notice to the fund. That's the only thing you have to do. There is this unique feature, too, in the PBGC regs that talk about any inconsistent provision of any agreement. Think about the breadth of that, the language used by the PBGC. You can't alter the initiation process without having an agreement that's executed after the assessment has been made. That's in 29 CFR 422.1.3. And they do that not only with respect to the initiation process. PBGC does that with respect to the cost feature, too. Can't change the cost, cost sharing, and that includes attorney's fees under the PBGC regulations. You can't alter those unless you have an agreement that's signed after the assessment. There's no such agreement here. Any type of agreement to the extent there was an agreement and to the extent it has expired was entered into well in advance of the assessment. It has to occur after the assessment. Let me talk about a minute the trust kind of angle that's been argued by central states here, that its appendix E of its trust somehow makes this untimely. Well, first of all, the trust and the trust provisions were never presented to PBGC in any form or fashion at any time for approval. They've never been approved. They've never been published in the Federal Register as being approved. And second of all, the features of the trust, including the shifting of costs, that it would include mandatory attorney's fees for central states in any arbitration it has, no concomitant provision for attorney's fees for employers in withdrawal liability arbitrations, and then its home field advantage here in Chicago. All arbitration is going to be held here in Chicago. Those are inconsistent with the PBGC regs, and they're inconsistent with the PBGC regs that approved of the AAA's processes back in 1986. They say the arbitrator gets to select the locale. We don't have a predetermined locale. And a matter of fact, to get attorney's fees, you have to almost rise to the level of Rule 11-type conduct. You're delaying or you're harassing the other party, so there's a standard there. They've shifted all of that, and they said, well, in our trust agreement here, this is the way it's going to operate, and it's never been approved or submitted for approval. And that is inconsistent with the statute because NEPA statute itself says you cannot have rules in a fund that are inconsistent with the PBGC rules. That's Title 29, USC 1399. I see my time is up. I may yield my six minutes to rebuttal if we can get a Federal Register site, but I see my time is up right now. Thank you, Counsel. Mr. Franczik. Good morning, Your Honors. May it please the Court, my name is John Franczik, and I represent the Appalese, in this case, Central States Pension Fund, and Arthur Bunty is one of its trustees. As the Court has already noted, the rules that were approved by the PBGC with respect to the initiation of arbitration in 1985 and 1986 are the same rules that the AAA is administering today. As the Court has noted, those rules require three things. First, notice to the opposing party. Second, a timely filing with the AAA. And third, the payment of the initiation fee. In this case, ALEGA Concrete Corporation neither gave the notice to the AAA within the time frame nor paid any fee within the time frame. In several cases, this Court has already addressed what is required for timely initiating an arbitration. In B&B lines, the Court held that those same conditions applied, as well as Chipman Trucking and Datela. In all those cases, the Court noted that those three requirements were necessary in order to validly initiate arbitration. As to Counsel's point regarding sending letters to central states, the Court in B&B lines said there is a clear distinction between a request for arbitration and the initiation of arbitration. It is as though a party said to another party, I plan to file a notice of appeal in this case and appeal it, but then doesn't file the actual notice of appeal in time under the rules. Although they gave the other side notice that they intended to file a notice of appeal, they wouldn't have in fact perfected the appeal by filing the notice in time. The District Court asked ALEGA to point out what discrepancies in the initiation of arbitration rules there were between what ALEGA refers to as the 2013 rules and the 1986 rules. The answer to that is there is none. What the rules themselves say and have said since 1986 is you give notice to the other party, you file with the AAA within the deadline, and you pay the fee within the deadline. The rules themselves don't specify what the fee is. It's just like the federal statutes regarding what the fee is for filing a notice of appeal in the Court of Appeals. The statute says you pay the fee in accordance with whatever the judicial conference says. And what the rules approved by the PBGC say, the AAA rules, all it says is you will pay the appropriate fee according to the fee schedule. Now, the fee has gone up. Nobody disputes that. But nothing in the rules themselves says that the fee will be and always shall be $650. Indeed, the AAA kept the fee at that amount for over 25 years without raising it. It would assume for the moment that the AAA decided it wanted to raise the fee $10 a year just because costs typically go up. It is not required to go to the PBGC each and every time it wants to change a fee and ask the PBGC if the fee is the same. And the PBGC always has the authority to revoke the rules. In the Federal Register, the approval states and the regulations state that the approval of the rules is effective unless and until the PBGC revokes it. So if the PBGC felt that for some reason the fees, as distinct from the rules, changed the game, the PBGC could revoke the AAA's rules. Was that what held it up? Is that a sense of it, at least, that it was because of the increased fee that you didn't want to pay that? We don't know. Honestly, I believe it's an after-the-fact justification for not complying with the initiation rules. As Judge Easterbrook pointed out, if they wanted to protest the fee amount, they could have, in theory, sent the demand to AAA within the time, paid the old fee, and I suppose rolled the dice on a subsequent challenge in federal court if the AAA or the arbitrator ruled that because they hadn't paid the fee, it wasn't timely. But here they did none of the steps. And we would submit that even if they had done the step of submitting the demand to AAA as it was required to do, and even if it had paid the old fee, which was $650 in this case, that would not have been sufficient because that is not the correct fee anymore. Was there actually a proper application? I shouldn't say proper, but a late application, but all those things were in at some point? Eventually, Your Honor, they did send a demand to AAA. They did pay the new $4350 fee, but well after the deadline. That's the whole issue then. Right. They eventually figured out how to do it, and apparently they were able to do it, they just didn't do it by the time that they were supposed to do it. And if this Court's precedence in B&B lines and shipment trucking, even an employer that sent the demand to AAA timely, but sent the payment in one day late, the Court held that was insufficient to demand and initiate an arbitration. Here they weren't even close to that level of compliance. As to the other arguments concerning what central states' rules may or may not say, first of all, we dispute the characterization of what the rules would require and not require. But as this Court has held most recently in its U.S. Foods decision, there's a distinction between whether an arbitration is validly initiated, which is for this Court, and issues that transpire once an arbitration is validly initiated. So, for example, the venue of the arbitration, or if there were to be a fee award in the arbitration, if they've raised those objections, if the arbitrator overruled their objections, they have a right, when the arbitration is done and the final award is entered by the arbitrator, to come to federal court and object to those things. But right now those arguments, A, are irrelevant because they haven't initiated the arbitration timely, so we'll never reach those arguments. B, even if they had timely initiated arbitration, the arbitrator might rule in their favor or there might not be a fee award, so they're prematurely asking the court to address such issues. Do we know why the fund didn't respond to the request for review? I do not, Your Honor. That sometimes happens, but as to their argument concerning that, the statute explicitly has timelines for initiating arbitration in the event the fund doesn't respond. So the statute explicitly contemplates if the fund doesn't respond within 120 days, the 60-day clock to initiate arbitration begins. So their argument that somehow not responding somehow excuses their noncompliance is incorrect because the statute tells you, it says if the fund responds, you have 60 days to initiate arbitration. If the fund doesn't respond within 120 days, you don't have to wait anymore. You have 60 days to arbitrate. The July 16th date then is the outer limit when the fund doesn't respond to a request for review? Correct, Your Honor. That is correct. So here, these rules have been in place since 1986 for over 25 years. They haven't changed. There are multiple precedents from this court affirming those rules, stating what those rules are, requiring those rules to be followed to the letter, to the day, to paying the fee, et cetera. There was plenty of notice to the world of how you needed to initiate arbitration, and the fact that central states is being blamed, or somehow the argument is that we sent letters to central states, but as the court already noted, there's a difference between sending a letter saying, I intend to do something and actually doing it. And in fact, even if a letter was sent, a timely letter was sent to central states saying, we hereby demand arbitration without the steps, the other steps of demanding the arbitration with AAA, following it with AAA, and paying the fee. They have not properly initiated arbitration. Just a few other points. ALEGA also contended somehow that it was denied discovery. It never requested discovery. The district court gave ALEGA notice that it intended to consider entering summary judgment against it, and gave ALEGA the chance to file something with the court. ALEGA filed a list of issues with the court, didn't identify a single fact in dispute, and didn't identify or file a motion under Federal Rule 56 asking for the while it conducted discovery. Unless there are any more questions, we ask that the court affirm the decision of the district court. Thank you, counsel. Anything further, Mr. Prytel? Yes. Since there were no Federal Register sites, I think I'm going to use my six minutes of time here. Let me get the language straight, Judge, because you were looking at a prior document, and there's been this argument that an intent is different from a demand for arbitration. The actual demand letter says that ALEGA Concrete Corporation and the asserted related contributing employers in withdrawal liability assessment, and then I cite the number of the assessment, demand arbitration of this withdrawal liability assessment. There could be no clearer way to demand it than saying, we demand arbitration. This was received by them in two ways. Is that what you're calling a notice? That's the notice, Your Honor, and that's fully compliant not only with the You might have sent it to the AAA together with the required fees. Judge, where do I send it to the AAA? Because the AAA says send it to any regional office of the American Arbitration Association. The Trust Fund for Central States says, no, no, no. You've got to send it to the Chicago office of the AAA. This is what happens when you make this stuff up. If you had sent it to the Richmond, Virginia office, and they had rejected it, you would have an argument. But you didn't send it to any office. You didn't enclose any fees. Right. And, again, we're operating under the 2013 unapproved, never submitted for approval rules of the AAA, Your Honor. Those rules also required me to do, as they conceded an oral argument here, $4,000 application fee. So that was really the deterrent then? Well, it was a deterrent for me in terms of telling my client, hey, you just have to send a notice into the fund. Now you have to come up with $4,000, and we have to remit it right away to an agency, whereas the prior filing fee was less than ten times that. I think the total filing fee and the processing fee under the 2013 rules is like $6,000. Under the 1986 rules it was $650. I understand that. I understand it's a problem, but that is the problem, I guess. That's why I didn't do it. You're right, Your Honor. The problem is that we have a set of rules that were tried to be and were implemented against my client inconsistent with a statute and inconsistent with what the PBGC rules said. Central States knows how to go before the PBGC and get approval of proposed rules, just as the AAA does. They never did that for these 2013 rules, and it has the components we all said. Now they cite the cases that I think Judge Mannion and Judge Easterbrook, you were involved in, but in two of those cases. That's the second time you've said that. It does not matter which judges are on a particular panel. Opinions speak for the court, and ad hominem arguments should be avoided. Yes, Your Honor. Prior precedents that they cited from this court, in two of those cases there was not a timely filing, even under the PBGC rules. And that's one of the cases, the Ditello case, and in the second case, Chipman Trucking. In all three cases, they never examined these unapproved, never submitted for approval rules of the 2013 American Arbitration Association. None of those cases address that, and that's what this case is about. How do you get and hold against a person inconsistent with the Administrative Procedures Act, which says, look, if there's a requirement to publish in the Federal Register and it's not published, it cannot be held against somebody. That's in the APA. That's all they needed to do was publish this or submit it for publication. They never did that. These rules were never approved in any form or fashion, let alone the escalated filing fee. So we wouldn't have to follow them then? Is that your position? Excuse me, Your Honor. You wouldn't have to follow those rules since they weren't submitted? No. The fallback rules and the presumptive rules are those of the PBGC. And the PBGC says, look, to initiate arbitration, all you have to do is send a timely notice to the fund. It is undisputed that was done here. They can deny all they want receiving it, but there is in the record an e-mail communication to three individuals of the trust fund, and then there is a signed FedEx receipt at the trust fund of what I read earlier, the demand for arbitration, the notice for arbitration. Those were all sent on the 9th and the 10th, and we know the D-Day was the 16th. So there was complete compliance with the PBGC rules, which are the presumptive rules in the absence of approved rules. We don't have any approved rules for 2013 here. To continue on with the cases, I think I've tried to tell you that all three of the cases, I think there's three of them, B and B didn't even deal with PBGC rules because at that time when that decision came out, the PBGC had not published any rules and had not gone around it. The statute passed in 1980. They didn't publish the rules until 1985. So that case has nothing to do with what we're talking about here. And again, all three cases, none of them addressed these unilateral rules that were created without following the statutory process, and the MEPA statute, forget about what the PBGC says. The MEPA statute at 1399 says you cannot, as a fund, try to enforce rules inconsistent with the PBGC rules. That's in the statute, and that's exactly what's happening here. They are enforcing rules that were unilaterally implemented by the AAA without being approved. Thank you, Counsel. Thank you, Your Honor. The case is taken under advisement.